#0685586

ORIGINAL

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

FILED
SEP 3 2008
U.S. COURT OF FEDERAL CLAIMS

ENVIRONMENTAL QUALITY MANAGEMENT, INC.
1800 Carillon Boulevard
Cincinnati, Ohio 45240,

Plaintiff

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 08-614 C

## COMPLAINT

Environmental Quality Management, Inc. ("EQM"), through its undersigned counsel, as and for its Complaint against the Defendant, the United States of America, avers as follows.

### Parties And Jurisdiction

1. Plaintiff EQM is a corporation organized under the laws of the State of Ohio, with its principal place of business at 1800 Carillon Boulevard, Cincinnati, Ohio 45240.

2. Defendant is the United States of America, acting by and through the Air Force Civil Engineering Support Agency (AFCESA), a subagency of the United States Air Force (USAF). The USAF, including AFCESA, is a "federal agency" within the meaning of 28 U.S.C. § 1491 (b) (1).

3. Jurisdiction is conferred by 28 U.S.C. § 1491 (b) (1).

**Nature And Summary of Action**

4. This Complaint challenges the award by AFCESA of contracts to ten offerors, and the concomitant decision not to award a contract to EQM, pursuant to Solicitation No. FA3002-06-R-0001 ("the Solicitation") issued in connection with the Sustainment/Restoration & Modernization (SRM) Acquisition Task Order Contract (SATOC) procurement. As detailed herein, the SATOC procurement was conducted in an arbitrary and capricious manner, and hence was contrary to applicable law.

**The Solicitation**

5. The Solicitation was issued on January 6, 2006 and contemplated a negotiated procurement pursuant to FAR Part 15 on a best value basis. The Solicitation provided for multiple awards of an indefinite delivery, indefinite quantity (IDIQ) contract with a base period of five years and five option years to support the issuance of task orders for design, planning and construction of military facilities in and outside of the continental United States. The procurement was conducted for AFCESA, the using agency, by the Air Education and Training Command Specialized Contracting Squadron (AETC CON) of the USAF. AETC CON provided the Source Selection Evaluation Team (SSET) and the Source Selection Authority (SSA) for this procurement.

6. Under the multiple award selection process described in the Solicitation, AFCESA reserved the right to make approximately ten to fifteen awards overall, with up to five awards for 8(a) contractors and other disadvantaged groups. Plaintiff EQM competed for award as a large business in the so-called "free and open competition" group.

7. The Solicitation was amended six times, and as amended called for offerors to submit separate technical and cost submissions, along with information about each offeror's

past performance on similar projects, for evaluation in accordance with a number of enumerated evaluation factors and subfactors. Technical proposals were to be evaluated against Factor 1, Mission Capability, and Factor 2, Proposal Risk, each of which contained four evaluation subfactors. Factor 3 was Past Performance. Factors 1, 2 and 3 were stated to be of equal importance, and in combination were "significantly more important" than Factor 4, Cost/Price. The Solicitation described a detailed rating system to be used by the SSET in the evaluation of technical proposals.

8. With their cost submissions, offerors were to submit a price proposal for a firm fixed price sample task order, and also submit fully burdened labor rates for a variety of enumerated labor categories. Such rates were required for work to be performed at the Home Office and for work to be performed in the Field. The statement of work for the sample task order was provided in the Solicitation, but the Solicitation stated that the sample task order "does not represent an anticipated requirement."

9. The Solicitation's rating system did not apply to the cost/price evaluation. Rather, cost/price was to be evaluated using "price analysis" to assess the reasonableness of the proposals, and to determine the offer providing "the best value and most advantageous approach to the Government." The Solicitation specified an evaluation scheme for determining the reasonableness of submitted prices, utilizing a pricing model. Under this scheme, the submitted labor rates for Home Office and Field work would be separately averaged by the SSET to develop an average labor rate for each type of work for each fiscal year of the Contract. Then a predetermined, but undisclosed, number of hours would be used to extend the average labor rate to calculate a total price for Home Office and Field work, respectively, for each fiscal year of the Contract. These yearly totals were summed to reach a total price for Home Office and a total price for Field work. The Solicitation provided that

the total price for the Sample Task Order was to be added to the total Home Office and Field prices to achieve a Total Evaluated Price for each offeror.

10. The Solicitation further specified that the government would evaluate price reasonableness "based upon a comparison of total evaluated prices among [o]fferors." Importantly, the Solicitation also provided that each offeror's sample task order price, a component of the Total Evaluated Price, was to be separately evaluated for reasonableness "via comparison to the Independent Government Estimate." The Solicitation stated that the Total Evaluated Price was to "be the basis for evaluating price for contract award decision purposes and will be the only price discriminator among Offerors."

11. After evaluation of proposals, the Solicitation contemplated award of multiple contracts under FAR Part 15 on a "best value" basis, taking into consideration the technical, past performance and cost/price evaluation factors, and their stated relative importance.

**The Evaluation And Award Decision**

12. Under the amended Solicitation, proposals were due by March 21, 2006. Twenty-two offerors, including EQM, timely submitted proposals. By letter dated April 9, 2007, the Contracting Officer notified EQM that its technical proposal had been evaluated as one of the most highly rated proposals and EQM had been included within the competitive range. The letter also set forth a number of comments for EQM to respond to, stating that this would constitute "discussions" with the offerors. The Contracting Officer then issued Amendment No. 6 on April 20, 2007. On May 1, 2007, EQM timely submitted its BAFO in response to the April 9, 2007 letter and Amendment No. 6. Upon information and belief, the other twenty-one offerors also submitted timely BAFO's for evaluation.

13. As part of the evaluation of technical proposals, the SSET performed a detailed evaluation of the Mission Capability factor and subfactors, and the Proposal Risk factor and

subfactors, assessing each offeror's relative "strengths" for each technical factor and subfactor. These detailed assessments were then translated into the designations used in the Solicitation's rating system. Under this system, Mission Capability assessments were assigned a color rating. For example, a "blue" rating was given to proposals that were "exceptional" as to a Mission Capability factor or subfactor, or a "green" rating was given for proposals that were "acceptable" for that factor or subfactors. Proposal Risk was designated within the rating system as either High, Moderate or Low. Past Performance was rated as to the level of "confidence" perceived by the SSET. Based on its evaluation, the SSET determined that Plaintiff EQM was in the group of the seventeen most highly technically rated offerors, based on Mission Capability, Proposal Risk and Past Performance.

14. The SSET also evaluated the price proposals, and followed the announced scheme in the Solicitation to the extent that the total Home Office price and total Field price were calculated for each offeror, and then added to the sample task price to create a Total Evaluated Price for each offeror.

15. Importantly, the SSET did not compare the Sample Task prices to the IGE or otherwise assess the reasonableness of the Sample Task prices in accordance with the Solicitation or the FAR, and thus departed from the evaluation scheme in the Solicitation. Instead, after developing the Total Evaluated Price for each offeror, the SSET simply calculated an average Total Evaluated Price, and then determined the percentage variance of each offeror's Total Evaluated Price from the average Total Evaluated Price. In this manner, EQM's Total Evaluated Price was found to be 3.24% above the average Total Evaluated Price. The lowest Total Evaluated Price was found to be 12.39% below the average Total Evaluated Price.

16. The SSET determined that all of the offerors' Total Evaluated Prices were reasonable, including Plaintiff EQM's Total Evaluated Price.

17. Based on the SSET's evaluation, the SSA selected ten of the free and open competition offerors as offering the best value to the government. The SSA made this decision by first making the determination that the seventeen most highly technically rated proposals from within the free and open competition group were "essentially equivalent" technically. The SSA also deemed the prices submitted by that group of seventeen offerors to be "reasonable," based on the SSET's price evaluation. The SSA then made the determination that nine of the most highly technically rated offerors provided the "best value" to the government because their Total Evaluated Prices were lower than the average Total Evaluated Price. Under this methodology, Plaintiff EQM was not selected for award, despite submitting one of the most highly technically rated proposals, because its Total Evaluated Price was 3.24% above the average Total Evaluated Price, and was not lower than the average. This was an arbitrary and capricious decision that departed from the announced evaluation scheme in the Solicitation. Upon information and belief, the ten selected offerors in the free and open competition group have now received Contract awards.

18. On or about January 8, 2008, EQM received a letter (misdated January 8, 2007) from the Contracting Officer stating that EQM had not been selected for award. EQM immediately requested a debriefing, which was conducted by telephone by the Contracting Officer on April 9, 2008. Prior to the debriefing, the Contracting Officer supplied EQM with a redacted copy of the Source Selection Decision Document ("SSDD") that was developed to formally document the steps taken by the SSET and SSA during the procurement. The SSDD does not state that as part of the price reasonableness evaluation the sample task order prices were compared to an IGE, as the Solicitation contemplates, and thereby demonstrates that this

step was not taken. During the debriefing, the Contracting Officer never stated that the sample task order prices were compared to the IGE.

19. Based upon the information learned by EQM for the first time in reviewing the SSDD, and in the debriefing, it is apparent that the SSA significantly departed from the announced evaluation scheme stated in the Solicitation in several respects, and its selection decision was arbitrary, capricious and violative of the law. These departures represent a significant violation of 5 U.S.C. § 706 (2) (A), the Competition in Contracting Act, the FAR, the FAR supplement, and the Solicitation, and EQM has been severely prejudiced thereby.

**Timeliness And Standing**

20. EQM has proceeded promptly at every stage of this procurement, and in the period following the debriefing, to assert its rights. By letter dated June 2, 2008, EQM submitted a draft of this Complaint to the Contracting Officer for review, suggesting that there were deficiencies in this procurement that needed to be resolved and requesting a telephone conference to discuss the issue. The Contracting Officer's office did not respond to EQM's letter until July 18, 2008, after which several telephone discussions between the parties occurred in late July, 2008. In those discussions, the government denied that any deficiencies had occurred in the procurement. This Complaint has been promptly filed approximately one month after the last of those discussions. There is no basis to suggest that EQM has created an unreasonable and prejudicial delay in asserting its rights that would support a finding of laches. This protest, therefore, is timely.

21. EQM has standing to file this action because it was an actual offeror in the procurement whose direct economic interest was affected by the government's violations of statute, regulation and the Solicitation. Accordingly, EQM is an "interested party" within the meaning of 28 U.S.C. § 1491 (b) (1).

## COUNT I

(Improper Price Evaluation)

22. Paragraphs 1 through 21 are incorporated by reference as if fully set forth herein.

23. Section M, Paragraph 6.1, of the Solicitation expressly provides that

> Proposed sample task prices will also be evaluated for reasonableness via a comparison to the Independent Government Estimate.

24. The SSET's failure to perform a price reasonableness evaluation of the sample task prices was a significant departure from the announced evaluation scheme, and thereby violated 5 U.S.C. § 706 (2) (A), the Competition in Contracting Act, the FAR, the FAR supplement, and the Solicitation. Further, this failure had the effect allowing unreasonably low sample task prices to be included within some offerors' Total Evaluated Price, and rendered the entire price reasonableness evaluation invalid, irrational, and therefore arbitrary and capricious.

25. The offerors were required to submit three prices: (1) labor rates for Home Office work to be utilized for future task orders, (2) labor rates for Field work, to be "the basis" for future task orders, and (3) a firm, fixed price sample task order price. Section M of the Solicitation specified that the sample task order price "does not represent an anticipated requirement," and hence would not be issued as an actual task order. Accordingly, the function of the price reasonableness evaluation was to ensure the various prices were not unreasonably low, and submitted solely to manipulate or "game" the procurement to secure award by obscuring the real pricing structure that offerors would utilize for task orders.

26. The comparison of the sample task prices to the IGE formed an essential part of

the Solicitation's evaluation scheme, and was intended to protect against such manipulation. For each offeror, three separate prices were summed together to reach the Total Evaluated Price. The "analysis" actually used by the SSET to evaluate these summed prices was essentially just to compare all of the offerors' Total Evaluated Prices. As to the Home Office and Field price components of the Total Evaluated Price, such an analysis can be valid and reasonable because these prices will be utilized in future task orders, and the offerors cannot be expected to disregard the consequences for future task orders of submitting unreasonably low labor rates for Home Office and Field prices.

27. That is not the case for the sample task prices. The offerors could be expected to understand that a comparatively low Total Evaluated Price would greatly improve their chances for award, and the sample task price increment could be manipulated to reduce that Total Evaluated Price. The sample task price amount is largely driven by the selection of labor categories, and estimates of the hours for each such category. An offeror preparing the sample task price needed only to select lower priced labor categories, and/or reduce the hours proposed for each category, and this would reduce the sample task price without any negative future consequences for "real" task orders. To prevent this potential for "gaming," the Solicitation required evaluation of the reasonableness of the sample task prices by comparison to the IGE. Without that step, there is no check in the evaluation scheme on gaming the procurement.

28. Unfortunately, the SSET did not implement this aspect of the announced evaluation scheme, to the prejudice of EQM. As actually conducted, the price analysis only compared Total Evaluated Prices, and upon information and belief some significant number of offerors "gamed" the procurement, and proposed unreasonably low sample task prices, as compared to the IGE. The end result was an invalid price reasonableness evaluation that

failed to detect these unreasonably low Total Evaluated Prices, which should have been rejected.

29. Had the SSET performed the price evaluation as outlined in the Solicitation, including the comparison of the sample task prices to the IGE, EQM's Total Evaluated Price would have been found to be lower than the average Total Evaluated Price, properly determined. In all events, there is a substantial likelihood that EQM would have been among the group selected for award as offering the best value for the government, and one of the most advantageous proposals. The SSET's failure to conduct the evaluation scheme in accordance with the Solicitation therefore severely prejudiced EQM, and was arbitrary, capricious, and contrary to applicable law.

**COUNT II**

(Improper Price Evaluation)

30. Paragraphs 1 through 29 are incorporated by reference as if fully set forth herein.

31. This Court should conclusively presume that no comparison of the sample task prices with the IGE was performed, because this step is not recorded in the SSDD. The entire purpose of the SSDD is to memorialize the steps taken by the SSA in this procurement, and its contents cannot be disputed by the government after the fact. However, even if the government contends that it did compare the sample task prices with the IGE in accordance with the Solicitation, the price evaluation was still invalid under the circumstances, and thus unreasonable, arbitrary and capricious.

32. The SSET improperly evaluated the reasonableness of the Total Evaluated Prices by simply comparing them to the average of those prices. All of the prices were found to be reasonable, and the SSA used only one, unreasonably simplistic methodology in

making the best value determination, which was to calculate the percentage variance from the average price.

33. This methodology was invalid under the circumstances, even if comparison was made to the IGE, because it fails to acknowledge the underlying reality that a large proportion of each offerors' Total Evaluated Price was comprised of the sample task price, which in turn was largely driven by estimated hours and labor mix selections. The Solicitation expressly stated that the sample task would not be issued as a real task order. In these circumstances, the SSET would have to use its best informed business judgment, and an appropriate methodology, to determine whether offerors were manipulating these estimated hours to unfairly reduce their sample task prices, and therefore their Total Evaluated Price. The methodology used, to simply calculate the percentage variance from the average, on the assumption that each offeror made a sincere effort to estimate the appropriate hours and labor mix, was invalid and therefore arbitrary and capricious.

34. As actually conducted, the price analysis only compared the Total Evaluated Prices, and upon information and belief some significant number of offerors "gamed" the procurement, and proposed unreasonably low sample task prices. The end result was an invalid price reasonableness evaluation that failed to detect these unreasonably low Total Evaluated Prices, which should have been rejected.

35. Had the SSET performed the price evaluation properly, the SSET would not have simply relied on calculation of an average Total Evaluated Price. The SSET should have compared the sample task prices to the IGE to determine if any of the prices appeared to be out of step and unreasonably low. Then the SSET should have selected a methodology to evaluate the prices in a way that addressed the basic reality that offerors can very effectively manipulate their Total Evaluated Price by reducing the hours proposed, and the

labor categories selected, for the sample task. Instead, the SSET merely prepared a simple average of the Total Evaluated Prices, and selected the offerors whose prices were at or below the average. Even if the SSET did utilize the IGE in accordance with the Solicitation, as its representatives have contended, the use of the average Total Evaluated Price in the described manner was standardless, ineffective and invalid, and hence the price evaluation was arbitrary, capricious and at variance with applicable law, to EQM's prejudice.

36. If the price evaluation had been properly performed, there is a substantial likelihood that EQM would have been among the group selected for award as offering the best value for the government, and one of the most advantageous proposals. The SSET's failure to conduct the evaluation scheme reasonably, and in accordance with the Solicitation, therefore severely prejudiced EQM, and was arbitrary, capricious, and contrary to applicable law.

**COUNT III**

(Improper Technical Evaluation)

37. Paragraphs 1 through 36 are incorporated by reference as if fully set forth herein.

38. The Solicitation provided that, in combination, the technical factors were "significantly more important" than price. Accordingly, the SSET performed a detailed evaluation of the Mission Capability factor and subfactors, and the Proposal Risk factor and subfactors, assessing each offeror's relative "strengths" for each such technical factor and subfactor.

39. The Solicitation provided that the SSET would utilize a color-coded rating system that assigned, for example, a "blue" rating for proposals that were "exceptional" as to the Mission Capability factor or subfactors, or a "green" rating for proposals that were

"acceptable" for that factor or subfactors. Proposal Risk was evaluated and designated within the rating system as either High, Moderate or Low. In performing the technical evaluation, the offeror's perceived "strengths" relating to the Mission Capability and Proposal Risk factors and subfactors were identified and then translated into the designations in the rating system. However, review of the detailed evaluations within the SSDD reveals that different proposals with wide variations in the perceived numbers of "strengths" for given factors and subfactors nevertheless received the identical rating, such as a "Blue" or a "Low" designation. In this way, the significant, detailed differences in the technical proposals were improperly glossed over and ignored in the evaluation.

40. The SSET determined that seventeen offerors were technically "essentially equivalent" because they all received the same "Blue" or "Green" ratings for the Mission Capability factor and subfactors, and a "low risk" rating for the Proposal Risk factor and subfactors. This use of the rating system improperly ignored very significant technical differences between the proposals, as determined by the SSET, and was arbitrary and capricious. Then, in the best value selection process, the SSA simply selected as the best value the lowest priced offers from among these seventeen "technically equivalent" offers, selecting ten offers for award from this group. This had the effect of ignoring and obscuring the significant technical differences between the proposals, in effect converting a best value-based award to a "technically acceptable, low price" award. This constitutes a significant and prejudicial departure from the announced best value selection process described in the Solicitation, and accordingly was arbitrary and capricious and therefore unlawful.

41. The best value selection process described in the Solicitation required the government to evaluate the relative technical merits of the offers, evaluate the prices, and document any "cost/technical tradeoffs" made by the SSA. If, for example, an offeror's

higher technical rating justified paying a comparatively higher price, then that would have to be explained and documented in the source selection statement. Likewise, if an offeror's lower technical rating was offset by a lower price, a cost/technical tradeoff would be required, and this had to be explained and documented. Here, the SSA ended up selecting a variety of lower technically-rated proposals, as evaluated by the SSET, for award over a number of higher technically-rated proposals (based on the SSET's evaluation) without the requisite cost/technical tradeoff and explanation, because the significant technical differences were obscured by misuse of the rating system.

42. EQM was substantially prejudiced by these actions because it had more "strengths" and a superior technical proposal than some of the offerors selected for award. This fact was obscured by misuse of the rating system, and the SSA's improper determination that EQM and each of the ten selected offerors were technically "essentially equivalent." This had the practical effect of allowing the SSA to avoid a detailed cost/technical tradeoff that would be necessary to select a lower-rated technical proposal over a higher-rated technical proposal, especially where, as here, technical factors were more "significantly more important" than cost factors. These improper actions led to conversion of this procurement to a "technically acceptable, low price" selection process, which was a substantial departure from the announced best value selection process. This was arbitrary and capricious and at variance with the law.

43. But for the SSET's misuse of the rating system and SSA's improper characterization of disparate technical proposals as "essentially equivalent," EQM had a substantial likelihood of being selected for award. Hence, the government was arbitrary and capricious in the conduct of the technical evaluation and the best value selection, and EQM was significantly prejudiced thereby.

44. The deficiencies described in this Complaint represent a significant violation of 5 U.S.C. § 706 (2) (A), the Competition in Contracting Act, the FAR, the FAR supplement, and the Solicitation, and EQM has been severely prejudiced thereby.

45. EQM has no adequate remedy at law, and has been irreparably harmed by the government's arbitrary and capricious conduct of this procurement, departures from the evaluation scheme announced in the Solicitation, and violations of statute and regulations. There will be no harm to the government by being ordered to terminate the contracts awarded under the Solicitation and required to reevaluate the proposals in accordance with the Solicitation and the law, and to make awards accordingly. This would also be in accordance with the public interest.

**Prayer For Relief**

WHEREFORE, Plaintiff EQM respectfully requests that the Court grant the following relief:

1. a declaration that the contracts awarded by AFCESA under the Solicitation are null and void, of no legal force, and must be terminated immediately;

2. issuance of permanent injunctive relief against further performance of the awarded contracts;

3. an order to recompete the acquisition in accordance with the requirements of the Solicitation and applicable statutes and regulations;

4. in the alternative, an award to EQM of its proposal costs;

5. an award of attorney's fees and costs of pursuing this action; and

6. such other relief as the Court deems just and equitable.

Respectfully submitted,

Brian W. Craver
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 (Tel.)
(202) 466-4416 (Fax)

Counsel for Environmental
Quality Management, Inc.

Dated: September 3, 2008